### L. P. BYRD V. THE STATE.

No. 17522.   Delivered April 17, 1935.
Rehearing Denied June 28, 1935.

The opinion states the case.

*Wilkinson & Wilkinson,* of Brownwood, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

LATTIMORE, JUDGE.—Conviction for burglary; punishment, five years in the penitentiary.

Mr. Graham lived out about eight miles from Brownwood in Brown County. About dark on the 12th of August, 1933, he left his home. He returned about ten P. M. and found that his house had been opened and a quantity of bed-clothing, and preserved and canned fruit, etc., had been stolen. Upon investigation he found about one hundred yards from his house a place where a car had stopped. There had been a very recent rain, and the tracks of the car, and of three men around the car and between the car and his house were observed. One of the tracks was made by a small shoe about a No. 6, and the others were much larger, being apparently made by shoes No. 9 or No. 10 size. Graham got a flash light and observed carefully the tracks of the car, which seemed to be made by almost smooth Goodyear tires on the rear wheels, and one of them was almost flat. He got some of his neighbors and they followed the car tracks from the place where it had been parked,—and to which the men's tracks went, from his house,—down a road to a gate leading into the place of this appellant. They went to town and got a search warrant and came back. They found no one at appellant's place, but not long after they got there appellant and one Alexander drove up. They were traveling in a 1926 Ford, which had on it three smooth tread Goodyear tires, and the right front tire was flat. He testified that said parties same to appellant's house in said car something after twelve o'clock at night. He further testified that the radiator of the car was boiling and the car was hot. Witness and his posse then back-tracked the Ford car in which appellant and Alexander drove to appellant's place, following the tracks through appellant's farm and on until they came to the house of Andy Page, some five or six miles from the home of appellant. Ap-

pellant lived about a mile or a mile and a half from Mr. Graham's home, the latter place being six or seven miles from the Page residence. When they arrived at Page's place he was on a bed in front of his house. On that bed and over Page was a blanket which had come out of Graham's house, and the lower part of a pair of pajamas was under a mattress of that bed which came also from Graham's place. In and around Page's house they found a quilt and a quantity of fruit and canned goods, also clothing belonging to Graham's children, and all of which Mr. Graham identified. It was in testimony that Page and appellant were large men, wearing shoes Nos. 9 or 10 in size, and that Alexander was a small man, wearing about a No. 6 shoe. The State also introduced a man named Hunt who testified that on the late afternoon of August 12, 1933, he was at the home of Andy Page, and was induced by Page and Alexander to take them over to the home of this appellant. He said they reached appellant's place a little before sundown. Witness observed Alexander, Page and appellant in conversation together at the front gate. Witness then left appellant's place accompanied by Alexander and Page. They drove down to a bridge about one or two hundred yards from Mr. Graham's house. Here Alexander and Page got out of the car and witness went on home. He testified that it was raining before they left appellant's house. Asked about the conditions of the casings on his car, Hunt said they were practically new.

Mr. Graham was corroborated by Mr. Avinger who testified that he saw the tracks of three men near Graham's house; that one set of tracks was made by a No. 6 or No. 7 shoe, and the other two sets by men who wore No. 9 or No. 10 size shoes; that these tracks led from Mr. Graham's house down toward a bridge. He also testified that the tracks of the car they followed were made by tires worn smooth, and that one of the tires showed to be of very low air pressure. He said they picked up these car tracks between the bridge and the Graham house, and that they tracked them up to appellant's place. Mr. Avinger also testified that he was at appellant's house when appellant and Alexander came up in a model T Ford about midnight. He observed the old worn out casings on the car, and that the right front tire was flat. There had been a shower of rain that day, and he said they back-tracked these car tracks across a field and on to the Page house. This witness was very positive that the tracks they followed from appellant's house six or seven miles to the Page house were made by the

car occupied by appellant and Alexander. Mr. Avinger testified that the shoes worn by appellant were No. 9 or No. 10, and that Page wore about the same size, and that Alexander wore a No. 6 or 7. This witness also testified that the car in which appellant and Alexander drove up to appellant's house about midnight was the same car that made the tracks down near the Graham house on the night of the burglary.

We have read with interest the able brief of appellant's counsel, but are not quite able to agree with him that the many authorities cited, in which the cogency and admissibility of evidence of tracks is discussed, warrant the conclusion that the testimony here is not sufficient under the law. If the only question here was the sufficiency of the tracks of the men near the Graham house, we might be inclined to agree with appellant.

The real probative force of the human tracks near Mr. Graham's house went to show that there were three different men engaged in the burglary and approximately the sizes of the shoes that they wore. The car tracks as followed by the witnesses from the Graham house to that of appellant, and the back-tracking of the car occupied by appellant and Alexander from the appellant's house back to the house of Page, where was found more than one hundred cans of fruits and vegetables belonging to Mr. Graham, together with bed-clothing and personal clothing which had been stolen that night,—seems to present a very strong chain of circumstances. We have appellant and Alexander coming in to the appellant's house after midnight. They are driving a model T Ford with smooth Goodyear casings, one of which is flat or almost flat,—making tracks fitting the exact description of the car tracks observed at Mr. Graham's. From appellant's house to Page's· house was about six miles, and the car was back-tracked from appellant's house to the home of Page where the stolen property was found. When Alexander and appellant reached the latter's house that night the radiator was boiling, showing that the car had been driven some distance. Late that afternoon at appellant's house, these same three men, appellant, Alexander and Page, were in consultation, after which Alexander and Page were driven by Hunt over in the immediate vicinity of Mr. Graham's house, where they got out of the car. The conclusion seems inescapable that appellant came later in his car and joined the other two, and that the burglary was committed by the three.

Finding no error in the record, the judgment will be affirmed.

*Affirmed.*

ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—It is urged upon rehearing that we were in error in holding the evidence sufficient to support the conviction. In view of appellant's motion and argument thereon we have been at much pains to again review the evidence. The facts are out of the ordinary in some particulars, demonstrating the truth of what has often been said, that is; that each case must stand or fall on the particular record in the individual case. We find in the statement of facts a map showing the location of the various roads, gates, residences and other things referred to in the evidence, without which map much of the testimony would not be properly understood nor the significance be apparent.

Mr. Graham's residence was near a public road. Traveling in a northeasterly direction from Graham's house and between one and two hundred yards therefrom was a bridge on said road over a small creek; farther east from the bridge was a gate on the south side of the road, which gate lead into the Eaton place or pasture; farther east from this gate was another on the north side of the road, which gate led to the house of this appellant. Farther northeast the road intersected the highway between Zephyr and Blanket. East towards Zephyr a road called the "Turkey Peak Road" turned south from said highway and lead past Dee Alexander's house and towards Andy Page's house. From the gate leading °into the Eaton pasture a road ran through the pasture and intersected this Turkey Peak Road not far from Dee Alexander's place. The approximate distance between certain places are given in our original opnion. The State's case is based upon the contention that appellant, Alexander and Page participated in the burglary of Graham's house. On the afternoon before the burglary that night Alexander was at Page's house. At their request a witness named Hunt drove them in his car to appellant's house where they arrived a while before sundown. Appellant, Alexander and Page had a conversation which was not heard by Hunt. The latter then drove Alexander and Page down to the bridge which was near Graham's house leaving appellant at his house. Hunt let Alexander and Page out near the bridge about sundown. Hunt turned his car around east of the bridge and went home, turning in at the Eaton gate and going through the Eaton pasture. When Graham returned home about ten o'clock he discovered that his house had been entered and there had been stolen bed clothes, children's wearing apparel, oue hundred fifteen cans of

meat and vegetables, seven or eight gallons of preserved fruit which was in pint, quart and half gallon containers. All of this property was found later that night at Page's house. The quantity of the stolen property was such that it could have been taken from Graham's place to Page's only in a vehicle of some kind. Upon investigation the tracks of three men were found leading from Graham's house down toward the bridge heretofore mentioned where apparently a car had been parked. Two of these tracks were large, corresponding in size to the shoes worn by appellant and Page, and one was smaller, corresponding in size to the shoes worn by Alexander. These tracks and the size of them bear significance only as a circumstance in connection with the other facts in evidence. The car tracks found by Graham showed that one front casing was very low, and that the car had come up the road west of the bridge, turned in front of Graham's house and gone back towards the bridge. This track of this car was followed, as Graham testified, back "across the bridge," towards the Eaton gate. Between Graham's house and said gate the car made two sets of tracks, one going towards Graham's house, the other away from it. The car tracks leaving Graham's apparently lead into the Eaton gate. From that point on to the gate leading into appellant's place there was only one track of the car, and witnesses thought they were back-trackng it, that is, that the tracks they followed from the Eaton gate to appellant's gate had been made by the car as it came from appellant's house to Graham's house. After the discoveries mentioned a search warrant was secured to search appellant's place. He was not at home. While the officers were there, and a little after twelve o'clock at night, appellant and Alexander arrived in appellant's car, Alexander driving. The car was hot; the casings corresponded to the impressions near Graham's house, and the front casing shown by the impressions there to have been low, was entirely flat when the car arrived at appellant's home. One of the officers and Graham, each with a flashlight, and one on each fender of the officer's car, back-tracked appellant's car. The tracks lead them to the highway between Zephyr and Blanket, east on said highway to the Turkey Peak Road, south on that road to the new highway between Brownwood and Zephyr, and east on that highway to the house of Page, who was found asleep, covered with some of the bed clothes which had been stolen from Graham's house a few hours earlier. All of the other stolen property was found at Page's house. How did it get there? The hypothesis suggested that Hunt participated in the bur-

glary, and that the stolen property was taken to Page's house in Hunt's car, is refuted by the evidence. That three parties were engaged in the burglary is an inference inescapable from the three sets of tracks found near the Graham house. Eliminating Hunt, which in our opinion the evidence does, it points to no others save appellant, Alexander and Page. The evidence seems to establish that the stolen property was taken to Page's in appellant's car. The natural inference arises that the three parties who perpetrated the burglary left the vicinity of Graham's house in the same car. Two men, appellant and Alexander, arrive in this same car at appellant's house after twelve o'clock at night. One man is missing, but when the car is back-tracked the third man—Page—is found in possession of all of the stolen property. From the map in evidence and the explanatory testimony, the inference is clear that appellant's car as it left Graham's place turned into the Eaton gate, went through the Eaton pasture to an intersection of the Turkey Peak road, then south on that road to Page's house, where the stolen property was unloaded, and that appellant and Alexander were just arriving at appellant's from the journey when they were greeted by the officers.

Because of the rather interesting and unusual circumstances relied on by the State we have written at greater length on rehearing than is ordinarily deemed necessary. From what has been said it follows that we remain of the opinion that the evidence is sufficient to support the verdict.

The motion for rehearing is overruled.

*Overruled.*